**K. Jamel WALKER and Dale R. Hurd, Plaintiffs,**

**v.**

**Jeanne S. WOODFORD, Director; Stuart Ryan, Warden (A), Does 1–10, Defendants.**

**Case No. 05cv1705–LAB (NLS).**

United States District Court, S.D. California.

Aug. 28, 2008.

K. Jamel Walker, Ione, CA, pro se.

Terrence F. Sheehy, Department of Justice, San Diego, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND ORDER OF DISMISSAL

LARRY ALAN BURNS, District Judge.

Plaintiff, a prisoner proceeding *pro se*, brought this action pursuant to 42 U.S.C. § 1983 for alleged Constitutional violations. Following dismissal of several claims, the sole remaining claim seeks damages for past violations of Plaintiff's Eighth Amendment rights. Plaintiff's second amended complaint (the "SAC"), filed *nunc pro tunc* to September 24, 2007, is the operative complaint. The essence of Plaintiff's claim is that he was subjected to cruel and unusual punishment because he was exposed to continuous lighting in his cell, resulting in insomnia and related health problems.

After Defendants filed a motion for summary judgment (the "MSJ"), Plaintiff filed a motion pursuant to Fed.R.Civ.P. 56(f) seeking to stay ruling on the MSJ pending further discovery, as well as a motion for additional time to conduct legal research. By a separate order, the Rule 56(f) motion is being denied and the motion for additional time is being granted in part. The MSJ is now fully briefed and ready for disposition.

## I. Discussion

### A. Factual Background

The facts, law, and procedural background have been addressed in several of the Court's earlier rulings. *See, e.g.,*

*Walker v. Woodford,* 454 F.Supp.2d 1007 (S.D.Cal.2006), *Walker v. Woodford,* 2007 WL 2406893, slip op. (S.D.Cal. Aug. 19, 2007). Except where noted, the following factual background is undisputed.

Plaintiff was a prisoner in Calipatria State Prison ("Calipatria"), a Level IV facility. The cells where Plaintiff was housed are furnished with two 34–watt fluorescent lights which can be turned on or off by inmates, as well as a 7–watt "night light." Because of the way Calipatria was constructed, this "night light" cannot be turned off and remains on 24 hours a day. In other housing units and institutions the "night lights" can be turned off. Prison officials at Calipatria have struggled with the proper way to deal with this situation. From 1994 to 2004, inmates were allowed to cover cell light fixtures at night. In the aftermath of an escape attempt by two other inmates,[1] however, Defendant Ryan on December 20, 2004 issued a memorandum prohibiting this practice. Defendants identify other reasons for this new policy as well. Apparently the new policy was not uniformly enforced, but Plaintiff says he was always subject to 24–hour lighting starting on December 21, 2004.

Plaintiff complained he began having increasing trouble sleeping, along with various physical, emotional, and mental symptoms such as headaches, eye strain, fatigue, irritability, and difficulty concentrating and sleeping. He was given Tylenol for his headaches and a booklet on techniques to sleep better. Plaintiff took the Tylenol initially but then stopped taking it because, he says, it exacerbated his heart and liver disease and caused other unwanted side effects. (SAC ¶¶ 35, 41.) Although one of the prison doctors offered to prescribe an antidepressant, Plaintiff refused it, reasoning that the lack of sleep was causing his depression, and not vice-versa. (*Id.* ¶ 38.) Prison doctors, however, declined to issue Plaintiff a medical chrono allowing him to cover his light, because of the policy forbidding it.

Plaintiff began exhausting his administrative claims on February 10, 2005 and filed suit in this action on August 30, 2005. On April 12, 2006 he was transferred to a different institution where he was no longer subject to 24–hour lighting, and there is no evidence he will be transferred back to Calipatria.

Defendants Ryan, Scribner, Grannis, and Ochoa (collectively, "Defendants") are the sole remaining Defendants in this case. Defendants Ryan and Scribner were acting wardens of Calipatria and Defendant Ochoa was the chief deputy warden. Defendant Grannis was the chief of inmate appeals. None of the Defendants are medical professionals.

Plaintiff alleges prison officials received complaints from prisoners about the lights remaining on. The number complaining of sleep-related problems, however, was limited (SAC at 13:16–17 (alleging Plaintiff was "one of several inmates" who had complained to the doctor about the light in their cell interfering with sleep); Walker Decl. in Supp. of Opp'n to MSJ, ¶ 12 (repeating reports from prison doctors that "several inmates complain[ed] of trouble they were having sleeping due to the lighting in their cells)), and Plaintiff's opposition to the MSJ provides the declarations

---

1. Defendants have submitted evidence showing the escaping prisoners dangerously close to success because lighting conditions prevented guards' discovering they were not in their cell, or noticing other signs that something was amiss. (Reply to Opp'n to MSJ at 6:1–8:2 (citing supplemental declaration by Defendant Ryan, describing escape attempt and officers' repeated failure to detect it).)

of four other Calipatria inmates showing they had trouble sleeping, which they believed to be caused by the lighting. (*See* Opp'n to MSJ, Ex. E (Declarations of Dale Hurd, Delaney Franklin, Arnold Levi, and Jerry Dunham).) These declarants describe the light as bright and the practice of 24–hour illumination as unusual in their experience. Other than Walker's former co-Plaintiff Dale Hurd, the most serious resulting problems these inmates report as a result of their difficulty sleeping are irritability and malaise.

### B. Legal Standards

#### 1. Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001).

The moving parties (*i.e.*, Defendants) bear the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving parties has met their initial burden, Rule 56(e) requires the nonmoving party (*i.e.*, Plaintiff) to go beyond the pleadings and identify facts which show a genuine issue for trial. *See id.* at 323–24, 106 S.Ct. 2548. The evidence cited must be admissible. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.2007) (citing Fed.R.Civ.P. 56(e)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.* (citation omitted). The Court need not "comb through the record" looking for evidence Plaintiff has failed to cite. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). Even so, because Plaintiff is proceeding *pro se* and bringing civil rights claims; thus, the Court construes his pleadings liberally. *Karim–Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir.1988).

The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegation or denials of his pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When the non-moving party bears the burden of proof at trial, summary judgment is warranted if the non-movant fails to make a showing sufficient to establish the existence of an element essential to its case." *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (citations, internal quotations, and alterations omitted). In this case, Plaintiff bears the burden of proof on his claim. Therefore, Defendants are not required to produce evidence showing the absence of a genuine issue of material fact, nor are they required to offer evidence negating the non-moving party's claims. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542–43 (9th Cir.1989).

#### 2. Eighth Amendment Claims

▮▮▮ The Constitution does not require comfortable prisons. *Rhodes v.*

*Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), *rev'd on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Conditions need not be optimal. *Id.* at 347, 101 S.Ct. 2392; *Hoptowit v. Spellman,* 753 F.2d 779, 784 (9th Cir.1985). They may in fact be restrictive or even harsh without violating the Constitution. *Rhodes* at 347, 101 S.Ct. 2392. The Court's function is not to oversee the decisions of prison officials and ensure prisons are well-managed, but merely to determine whether a Constitutional violation has occurred and, if so, to fashion an appropriate remedy. *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir.1982) (citations omitted). The Court accords prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolfish,* 441 U.S. at 547, 99 S.Ct. 1861.

▆▆▆ That said, the Eighth Amendment prohibits the unnecessary and wanton infliction of pain. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), as well as deliberate indifference to serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In order to establish liability, Plaintiff must show that Defendants knew of, and disregarded an excessive risk to his health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The "deliberate indifference" standard requires more than ordinary lack of care; unless Defendants were both aware of facts from which they could infer that a substantial risk of serious harm exists, and also actually drew that inference, they are not liable. *Id.* at 835, 837, 114 S.Ct. 1970. Defendants' failure to alleviate a risk they should have perceived but in fact did not is

not an Eighth Amendment violation. *Id.* at 838, 114 S.Ct. 1970. Plaintiff must show each Defendant's liability, including showing how each Defendant caused him harm. *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988).

### 3. Qualified Immunity

▆▆▆ Defendants have raised the affirmative defense of qualified immunity. Under this doctrine, state officials performing discretionary functions are immune from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Somers v. Thurman,* 109 F.3d 614, 617 (9th Cir.1997). Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citations omitted).

▆▆▆ The qualified immunity inquiry involves a two-pronged analysis. The Court first asks whether the law governing the official's conduct was clearly established, and if so, whether under that law a reasonable officer could have believed the conduct was lawful. *Rogers v. County of San Joaquin,* 487 F.3d 1288, 1296–97 (9th Cir. 2007) (citations omitted). It is not necessary for a case to be on "all fours" with the facts presented here, however, for the right to be "clearly established;" the contours of the right need only be sufficiently clear that a reasonable official would understand what he was doing violated that right. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (further citation omitted)).

### C. Discussion
### 1. Legitimate Penological Concerns

▆▆▆ Defendants have raised the additional issue of whether legitimate peno-

**1146**

logical concerns justify continuous illumination. For obvious reasons, for which Defendants have provided evidence, prison officers need to be able to see into prisoners' cells at night, either to conduct cell checks, or for other reasons. Officers need to be able to verify that prisoners are in their own cells and are not engaged in any illicit activity. Officers approaching or passing by cells also need to be able to look into them from a distance without exposing themselves to attack.

At some facilities officers use flashlights; at others, they can switch cell lights on or off using a switch outside the cell. In most cells at Calipatria, a "night light" is kept on. Each of these methods has its advantages and disadvantages. Here, Defendants argue keeping the light on is less disruptive than turning it on, or shining lights in inmates' faces. Plaintiff disagrees, declaring that officers at Mule Creek State Prison, where he is now held, turn on cell lights to conduct cell checks, except at night when they use flashlights. (Walker Dec., ¶ 21). He claims no inmates there find this disruptive, though he does not say how he knows this to be true. (*Id.*) He also presents the declaration of another inmate formerly housed at Pelican Bay State Prison, Corcoran State Prison, California State Prison at Sacramento, and Calipatria's newer Administrative Segregation Unit (which uses a different lighting system) stating that prisoners there are permitted to cover their lights or turn them off, and officers conduct cell checks using flashlights. (Franklin Decl. in Supp. of Opp'n to MSJ.) Calipatria has several times changed its policy of allowing inmates to partially cover their "night lights," citing fire hazards and repeated abuse by inmates who deliberately obscure too much of the light. Plaintiff does not dispute these dangers, but argues Calipatria's administration has better alternatives

than an outright ban on covering "night lights." (Opp'n to MSJ at 10:5–13:2.)

The Court need not engage in this detailed policy discussion, however, because the issue of which lighting method is least disruptive is beside the point. Defendants are not required to use the method most liked by inmates, or the method judged best by the Court. Rather, they are only required to use a method that does not unnecessarily and wantonly inflict pain. If there were evidence the method in use at Calipatria had inflicted significant harm or suffering on Plaintiff they might then be required to explain why legitimate penological interests justified it. It may be that other inmates have experienced health problems caused by the light, or have to endure brighter lighting than Plaintiff did. Because, however, Plaintiff presents no evidence showing the 24–hour illumination policy was the cause of *his* insomnia or any related problems, the Court need not delve into the issue further.

**2. Causation**

Plaintiff contends 24–hour lighting under any circumstance is a *per se* violation of inmates' Eighth Amendment rights, on a par with failure to provide food or water. The Court has already ruled on this issue, *see* 454 F.Supp.2d at 1013–14, and finds no reason to revisit its earlier ruling. Although Plaintiff argues anything short of total darkness is harmful, he has never been able to cite any case so holding, nor has the Court found any, nor would the evidence he presents support such a finding. Rather, all available relevant binding or persuasive authority addressing the issue has considered whether the lighting caused harm and, even where it did so, whether the harm was justified by a legitimate penological concern.

The MSJ attacks Plaintiff's theory of causation on two fronts. First, Defen-

dants argue the light in Plaintiff's cell as he lay in his bunk was not bright enough to cause the problems he claims it did. Second, they argue Plaintiff has no evidence his insomnia and related problems were caused by the light, as opposed to something else such as stress, anxiety, or a pre-existing medical condition.

### a. How Bright Was the "Night Light"?

It is uncontested the light bulb used in Plaintiff's "night light" during the relevant period was a Sylvania 7-watt compact fluorescent bulb, and that it emitted no more than 400 lumens. The parties disagree on just how bright this is. Plaintiff estimates, citing some evidence, this is about as bright as a typical 30-watt bulb (Opp'n to MSJ at 3:16–19), or perhaps even as high as a 40-watt bulb. (*Id.* at 3:3–5.)[2]

Defendants have submitted the declaration of C. Montano, a records custodian, who states that Calipatria's logs show that from June 12, 2003 to July 31, 2005, Plaintiff was assigned to cell 134 in housing unit 5 of facility D. (Montano Decl. in Supp. of MSJ, ¶ 10.) Montano also declares Calipatria's records show that on July 31, 2005, Plaintiff was assigned to cell 118 in the same housing unit, where he remained until he was transferred out on April 12, 2006. (*Id.*) In both cells, Plaintiff was assigned to the lower bunk. (*Id.*)

Defendants have also submitted the declaration of Jeff Bennett, a licensed electrician employed at Calipatria. Bennett provides his credentials showing he knows how to take the kind of light measurements necessary to comply with building codes. (Bennett Decl. ¶ 2.) Bennett took what appear to be careful, appropriate measurements in cell 134 and states the distance from the "night light" to the face of a person lying on his back on the bottom bunk is approximately eight feet five inches to the light. The light he measured at this distance from the "night light," in the evening and with the cell door closed, was .12 foot candles (*i.e.*, .12 lumens per square foot). (*Id.* ¶ 8.) If the inmate were able to turn his head towards the wall, the distance would be approximately eight feet nine inches from the light and the light would be .08 foot candles. Plaintiff has no evidence of his own on this point.

Dr. Poceta's declaration explains that .08 to .12 foot candles is equivalent to about 1 lux (Poceta Decl. ¶ 5), which he states is roughly equivalent to full darkness with a full moon on a clear night. (*Id.*, ¶ 7.) Based on Bennett's other measurements, Poceta concludes the brightness of the light experienced by prisoners lying in their bunks in cell 134 would be no brighter than the amount of light twenty minutes after sunset, even if they were in the top bunk. (*Id.* ¶¶ 5, 7, 8.)

Defendants also present evidence that individual estimates of the brightness of light can vary depending on conditions. Poceta explains that as the night prog-

---

2. One of the inmate declarations suggests the light in some other cells may be brighter. (*See, e.g.,* Delaney Decl. ¶¶ 3, 6 ("It is as bright as regular daytime light.")) This discrepancy is unexplained; it may be that a more powerful light bulb was installed in some cells, or perhaps that the inmate was positioned much closer to the light bulb. The relevant inquiry here, however, is how bright the light was in Plaintiff's cell as he lay in his bed either sleeping or trying to sleep.

Several other unpublished cases in this circuit reference a 7-watt fluorescent bulb which, they suggest, may be about as bright as a child's night-light, but do not specify whether it is the same type of bulb or whether it emits the same amount of light. *See, e.g., Hernandez v. Schriro,* 2008 WL 192343 slip op. at *9 (D.Ariz., Jan. 22, 2008).

resses and individuals' eyes adapted to the darkness, even dim light might seem bright. (Poceta Decl. ¶ 10.)

## b. Did the Light Cause Plaintiff's Insomnia and Medical Problems?

 Defendants have presented expert testimony that, while certain levels of lighting may interfere with sleep and cause other health problems, dim lighting at the level Plaintiff experienced would not. (Poceta Decl. ¶¶ 8–10.)[3] To resist summary judgment, Plaintiff must therefore point to evidence establishing a genuine issue of fact for trial. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. His evidence must be admissible. *Soremekun*, 509 F.3d at 984.

Plaintiff has alluded to a conversation with a prison doctor in which the doctor opined that "light is bad for the brain." (Walker Decl., ¶ 11.) This remark, however, even if it were admissible, does not show that any degree of illumination at all during sleep is bound to cause psychological or physical harm. Nor does it show the lighting caused Plaintiff's insomnia and related problems, which is the real issue here.

Plaintiff also cites extensively from two scientific works in support of his contention that nighttime illumination causes health problems. (Opp'n to MSJ at 4:1–8:3 and Exs. B and C (articles on effect of light on circadian rhythms and cancer).) Exhibit B is an excerpt of a larger work published by the Electric Power Research Institute ("EPRI") and entitled Relationship Between Light and the Development and Growth of Internal Solid Cancers: A Review of Current Research and the Potential Implications for Lighting Practice, publication number 1011162 ("EPRI Article").[4] This is an industry report, and there is no indication it is peer-reviewed or subject to verification. The article describes itself as a "white paper" summarizing technical knowledge and giving speculative recommendations for lighting practices. (Ex. B at 1.) Sections of the work Plaintiff has omitted explain the document is a corporate document describing research sponsored by EPRI and the McClung Foundation, *see* EPRI Article at 5, contain very prominent disclaimers, *see id.* at 4, and state the document was prepared as an account of work sponsored by EPRI. *See id.* Exhibit C is an abstract by Stephen M. Pauley, M.D. hypothesizing that exposure to

---

**3.** Plaintiff has challenged Dr. Poceta's qualifications as an expert, the admissibility of his testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and the helpfulness of his testimony to the Court. Dr. Poceta is a licensed physician and a consultant in neurology and sleep disorders for the Division of Neurology at Scripps Clinic in La Jolla, California. His education, experience, and other credentials are extensive and the Court finds him qualified to give expert testimony on the subject of the effect of illumination on sleep and overall health. As an expert witness, Dr. Poceta may properly consider Plaintiff's medical records and the declarations of percipient witnesses in forming and expressing his opinions. The Court finds Dr. Poceta's testimony

as set forth in his declaration both relevant and admissible. Even if Dr. Poceta's testimony were not admissible, however, Plaintiff would be in no better position.

In citing Dr. Poceta's declaration, Defendants are not only presenting their own evidence, but also pointing out that Plaintiff lacks evidence. Because he bears the burden of proof, Plaintiff was required to come forward with evidence.

**4.** Plaintiff did not supply this information in his briefing, but erroneously identified it as publication 1009370 without providing a title or author. The article is available on EPRI's website at http://my.epri.com/portal/server.pt? which is searchable by document number.

light at night may be one reason for higher rates of breast and colorectal cancer.

If called to the attention of an expert on cross examination, Fed.R.Evid. 803(18) might permit the admission of these articles as learned treatises. It is doubtful, however, either exhibit (or even the complete EPRI Article) is authoritative or reliable enough under *Daubert* to be admissible for the purpose for which Plaintiff offers them. Scientific literature does not generally contain prominent disclaimers as the EPRI Article does. Exhibit C is little more than a hypothesis and does not claim authoritative status for itself. Defendants' reply to Plaintiff's opposition to the MSJ cites Dr. Poceta's similar interpretation of the articles. (Reply to Opp'n to MSJ, at 3:18–19.)

Even assuming, *arguendo*, these articles were admissible, they do not help Plaintiff, because they do not link nighttime exposure to light with insomnia or any of the other problems Plaintiff suffered. Rather, they suggest that even very dim nighttime illumination may decrease melatonin production and increase the risk of cancer. Even less helpful to Plaintiff, these articles both assume as part of their hypotheses that people can and do sleep in the presence of light. Defendants, in their reply to Plaintiff's opposition to the MSJ, cite Dr. Poceta's supplemental declaration explaining the distinction between excessive illumination, which might interfere with sleep, and the theory that even very dim light might increase cancer risk. (Reply to Opp'n to MSJ, at 3:6–19.)

■ Plaintiff is able to show by his own testimony that his sleep problems and related symptoms began not long after the new policy was put in place (Walker Decl. ¶ 7), which could give rise to a reasonable reference that nighttime lighting and his symptoms were somehow related. Insomnia may have many causes, however (Poce-

ta Decl. ¶ 11), so it does not necessarily follow that the lighting itself caused his sleeplessness or other symptoms such as anxiety and depression. *See Railway Labor Executives Ass'n. v. Dole,* 760 F.2d 1021, 1021 (9th Cir.1985) (holding it was logically fallacious to conclude increased accidents were due to a change in safety policy merely because the increase occurred after the change in policy). At most, the timing would show the new lighting policy was a *possible* cause of Plaintiff's insomnia. Ordinarily, where symptoms could be caused by any of several factors, medical evidence, including a diagnosis, is needed. *See In re Paxil Litigation,* 218 F.R.D. 242 249 (C.D.Cal.2003) (citing *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1413 (D.Or.1996)).

Plaintiff makes clear he lives under a great deal of stress, and says other inmates plotted to have him murdered. (Walker Decl., ¶ 5.) Dr. Poceta's declaration points out Plaintiff medical records show he repeatedly suffered from physical and psychological problems that might have interfered with his sleeping, including depression and stress in November, 2004, just before the new policy was put in place. (Poceta Decl., ¶ 3(E).) These problems could have caused Plaintiff's insomnia, which in turn could have caused other symptoms. (*Id.* ¶ 12.) Dr. Poceta's declaration also provides evidence that, if a person is suffering from insomnia for some other reason, he might pay undue attention to a nearby light source, which could contribute to his frustration at being unable to sleep. (*Id.* ¶ 12.)

Perhaps even more significantly, Plaintiff's insomnia and other symptoms do not coincide with the lighting policy. Plaintiff's declaration suggests he had experienced mild symptoms before the new lighting policy was put in place. (Walker Decl., ¶ 7 ("I had not experienced this series of

symptoms, nor had trouble sleeping this severe before [the new policy].")) Dr. Poceta's declaration shows Plaintiff complained of difficulty sleeping and related problems into 2007, well *after* his transfer out of Calipatria on April 12, 2006 and into a facility where he could sleep with the lights off. (Poceta Decl., ¶ 3(F), Montano Decl. ¶ 10.) Plaintiff provides no evidence to rebut this, or to show the kinds of symptoms he experienced could continue for many months after the exposure to nighttime illumination ceased.

While Plaintiff himself believed his sleep difficulties and related symptoms were caused by the lighting, he provides no medical evidence of this at all. If his medical records contained any such evidence, he could have submitted them. In fact, there is no indication such evidence might exist.

The most obvious source of a diagnosis or some other indication of causation would be from the three doctors at Calipatria who examined him or otherwise supervised his treatment. But while Plaintiff reports his conversations with them, there is no indication at all that any of them shared his belief that the lighting was causing his insomnia and health problems. Rather, it was Plaintiff who reached this conclusion, and told his doctors what he thought the cause was; the doctors' statements as reported by Plaintiff are noncommittal, merely acknowledging the complaints and suggesting Plaintiff ask the warden to change the policy. (Walker Decl., ¶¶ 10–12; *cf.* SAC at ¶¶ 34–48.) While previous briefing suggests the doctors might have wished for a different lighting policy, and might have written Plaintiff a medical chrono allowing him to cover his "night light" had they thought the chrono would be honored, there is nothing in the record to show they knew or believed a change in the lighting policy

would have relieved Plaintiff's symptoms. Instead, they offered several different treatments, which he refused. If Plaintiff was ever examined by any other doctor, he presents no evidence of this.

This points up an additional insuperable evidentiary problem Plaintiff faces which could not be resolved by the additional discovery he seeks. Medical evidence of causation is apparently unavailable either from any doctor who treated Plaintiff while he was suffering from insomnia, or in Plaintiff's medical records. According to Dr. Poceta's recitation of Plaintiff's medical history, Plaintiff is no longer complaining of insomnia or related problems. Thus, there will never been an opportunity for a new treating physician to examine Plaintiff and diagnose the cause of these symptoms. Medical evidence sufficient to establish causation would therefore not be available now matter how much additional discovery Plaintiff might be granted.

 A further problem Plaintiff faces is that he provides no evidence of the severity or frequency of his medical problems. Mere routine discomforts or minor deprivations do not violate the Constitution. *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The available medical evidence shows the doctors at Calipatria believed using relaxation techniques and changes in personal habits would help him sleep, and that some or perhaps all of his symptoms were treatable. There is therefore no evidence Plaintiff's insomnia and symptoms caused him the kind of psychological and physical pain that would give rise to a Constitutional violation. Recently in a similar case, a sister court held that treatable sleep disruption caused by 24–hour illumination was not actionable under § 1983 because it did not constitute sufficiently serious harm. *Grenning v. Bisson,* 2008 WL 819313 (W.D.Wash. March 14, 2008)

("Plaintiff has failed to produce evidence of a sufficiently serious injury caused by the continuous lighting in his cells. Although he asserts that his inability to sleep amounted to a disturbance in sleep patterns and others took medication.") While Plaintiff has alleged he experienced headaches, eye strain, fatigue, irritability, frustration, depression, and difficulty concentrating and sleeping, he has provided no evidence of the frequency or severity of these symptoms except to say they grew worse over time. Plaintiff's admission that he refused medication merely because he did not believe it was the best treatment underscores this defect in his case.

Defendants have provided a good deal of evidence other factors could have interfered with his ability to sleep and in turn caused his other symptoms. Plaintiff presents no evidence these other factors were not present, but simply assumes they did not cause his insomnia. His own speculation about the cause of his insomnia and other symptoms, however, does not suffice to withstand summary judgment. *Soremekun*, 509 F.3d at 984. Summary judgment would therefore be appropriate on the issue of causation alone.

### 3. Qualified Immunity

■ Defendants specifically raised this defense, both in their answer (Answer to SAC, ¶ 86), and in the MSJ. (Mem. in Supp. of MSJ at 23:10–24:15.) Because there is no genuine issue of material fact regarding causation, the Court need not, and ordinarily would not, reach the issue of qualified immunity. *Billington v. Smith*, 292 F.3d 1177, 1191 and n. 85 (9th Cir.2002) (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). In this case, however, because Plaintiff's claim fails because of lack of evidence and because additional discovery is being denied, the Court considers it prudent to examine qualified im-

munity as an alternate basis for its holding.

In *Keenan v. Hall*, 83 F.3d 1083, 1090–91 (9th Cir.1996), the Ninth Circuit held "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." (quoting *LeMaire v. Maass*, 745 F.Supp. 623, 636 (D.Or.1990), *vacated on other grounds*, 12 F.3d 1444, 1458–59 (9th Cir.1993)). In that case, the inmate plaintiff had alleged

> large florescent lights directly in front of and behind his cell shone into his cell 24 hours a day, so that his cell was "constantly illuminated, [so that he] had no way of telling night or day," and that this condition caused him "grave sleeping problems" and other mental and psychological problems.

83 F.3d at 1091. The Ninth Circuit found summary judgment for the defendants was inappropriate.

*Keenan* does not stand for the proposition that all 24–hour illumination in prisons as Plaintiff argues, and it has not been interpreted this way. *See, e.g., Sisneroz v. Whitman*, 2008 WL 1734585, slip op. at *4 (E.D.Cal., April 11, 2008) ("Requiring inmates to live in constant illumination, under certain circumstances, [may] rise to the level of an Eighth Amendment violation.") (citing *Keenan* at 1090); *DuBois v. McDonald*, 2007 WL 1659113, slip op. at *5 (D.Mont. June 5, 2007) (while acknowledging *Keenan*, explaining "dimmed 24 hour lighting does not rise to the level of a constitutional violation").

■ The Court therefore holds the law is clearly established that prison officials may not require inmates to suffer physical and psychological harm by living in constant illumination. On the other hand, it is *not* clearly established that prison officials may not require inmates to live in constant

illumination; that theory has been considered and rejected by many courts. The Court therefore must determine whether under this law, reasonable officials in Defendants' position could have believed their conduct was lawful. *Rogers*, 487 F.3d at 1296–97.

As set forth above, there is no evidence Plaintiff was suffering physical and psychological harm as a result of Calipatria's new lighting policy. At most, Defendants knew some inmates were complaining about the lighting; Plaintiff points to no evidence they knew Plaintiff or anyone was suffering harm as a result, much less severe harm. As Plaintiff himself says, the prison doctors suggested Plaintiff himself ask the warden to change the policy; there is no evidence or even any reasonable likelihood they told any Defendant the lights were causing medical problems.

 As Plaintiff himself points out (Opp'n to MSJ at 17:18–21), earlier cases such as *Keenan* did not address the permissible brightness of the light. Rather, the legal analysis has analyzed each case on its own merits. and has suggested prison officials have discretion to require low-level lighting 24 hours a day for security purposes. *Clark v. Stotts*, 1996 WL 583454, slip op. at *2 (D.Kan. Sept. 9, 1996).[5] At least one other Circuit has determined 24–hour lighting from a 40–watt incandescent bulb was Constitutionally permissible. *Pawelski v. Cooke*, 1991 WL 403181, slip op. at *4 (W.D.Wis. July 18, 1991) ("Having a single 40 watt light bulb on 24 hours a day for security purposes amounts to no more than an inconvenience to the segregation inmates."), *aff'd*, 972 F.2d 352 (7th Cir.1992) (table opinion). One case from this Circuit has found that a bulb emitting as much as 800 lumens and located 4 to 5 feet from inmates' faces while they were sleeping were Constitutionally permissible unless accompanied by a showing of serious harm. *Wills v. Terhune*, 2006 WL 335455, slip op. at *4–*6 and *9 (E.D.Cal. Feb. 10, 2006) (report and recommendation, adopted by 2006 WL 842385 (E.D.Cal. March 29, 2006)). And finally, a case from the District of Arizona, decided in 2006 and just recently affirmed by the Ninth Circuit on the narrow basis of lack of causation, examined facts very similar to those presented here and found no Constitutional violation. *Hampton v. Ryan*, 2006 WL 3497780, slip op. at *12–*13 (D.Ariz. Dec. 4, 2006), *aff'd* 288 Fed.Appx. 404 (9th Cir.2008).

These cases suffice to show that during the time Plaintiff was held at Calipatria there was no clearly established law forbidding them from keeping the equivalent of a 30 or 40 watt incandescent bulb on 24 hours daily in inmates' cells, absence a showing they knew Plaintiff was being severely harmed. Even Plaintiff could cite authority to the contrary, it would at best show the law was unsettled. Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S. at 229, 112 S.Ct. 534.

In addition, Dr. Poceta's declarations submitted in support of Defendants' briefing state there is no clear scientific evidence or agreement within the scientific community that the level of lighting Plaintiff was subjected to could cause harm. (*See, e.g.*, Poceta Suppl. Decl. ¶ 9 (citing authorities in support of his position).) Although the Court does not weigh evidence, it is clear Plaintiff would have no way—

---

**5.** This and other unpublished opinions are cited for the permissible factual purpose of showing notice—*i.e.,* what Defendants might reasonably have believed the law to require at the time they were making their decisions. *See* 9th Cir. Rule 34–3(c)(ii).

even if had expert testimony—to show the scientific and medical community was in agreement that dim light could cause the kind of harm Plaintiff says he suffered. Defendants are not medical or scientific experts, and cannot be expected to make medical or scientific judgments on their own. *Meyer v. Schwarzenegger,* 2008 WL 2223253, slip op. at *10 (E.D.Cal., May 27, 2008) (citing cases). There is no evidence anyone with medical or scientific training told them dim light would likely cause the kind of harm Plaintiff was suffering, or that such an opinion would have reflected scientific consensus. Even if it turned out Defendants were mistaken in believing dim light was harmless, their error would at most be a mistake in judgment; Plaintiff could not show they were "plainly incompetent" in believing this, or that they knowingly violated the law. *Hunter,* 502 U.S. at 229, 112 S.Ct. 534.

Finally, Defendants have provided evidence showing the lighting policy was formulated based on Defendant Ryan's experience at Calipatria with the previous escape attempt. (Reply to Opp'n to MSJ, at 6:1–8:2 (citing Defendant Ryan's supplemental declaration).) Because of this experience, Defendant Ryan—and, by extension, the other Defendants—could reasonably have believed the lighting policy was necessitated by legitimate penological concerns and that the policy in place before the escape attempt was inadequate. As discussed above, the Court need not evaluate whether, in retrospect, another less intrusive lighting policy would have sufficed. The point for the qualified immunity analysis is that it cannot be shown Defendants knew some other, less intrusive policy would have sufficed, or were plainly incompetent in not knowing it. This, too, supports their defense of qualified immunity.

In view of the absence of evidence Defendants knew Plaintiff was being severely harmed as a result of the lighting policy, and because there is no clearly established law forbidding the lighting policy at Calipatria, Defendants were not plainly incompetent in acting as they did, nor is there any evidence they knowingly violated the law. Even if this Court were now to hold the policy then in force at Calipatria unconstitutional—which it does not—Plaintiff would at most have shown Defendants' judgment was mistaken. Defendants are therefore entitled to qualified immunity.

## II. Conclusion and Order

For these reasons, Defendants' motion for summary judgment is **GRANTED.** The SAC is **DISMISSED WITH PREJUDICE.** All pending motions are **DENIED AS MOOT.**

**IT IS SO ORDERED.**