**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS ROGERS; NICOLE ROGERS,
an individual; STEVEN KAHNCOCK,
Guardian ad litem for minors
Thomas R. Rogers and Shelby
Rogers,
          *Plaintiffs-Appellants,*

          v.

COUNTY OF SAN JOAQUIN;
CHARLOTTA ROYAL, individually
and in her official capacity as
social worker for the County of
San Joaquin Human Services
Agency; DENISE WEST, individually
and in her official capacity as
social worker for the County of
San Joaquin Human Services
Agency; CITY OF LODI; DENNIS
LEWIS, individually and in his
capacity as police officer for the
City of Lodi,
          *Defendants-Appellees.*

No. 05-16071

D.C. No.
CV-02-01961-DFL

OPINION

Appeal from the United States District Court
for the Eastern District of California
David F. Levi, District Judge, Presiding

Argued and Submitted
April 16, 2007—San Francisco, California

Filed May 29, 2007

Before: Warren J. Ferguson, Stephen Reinhardt, and
Milan D. Smith, Jr., Circuit Judges.

6313

Opinion by Judge Reinhardt

**COUNSEL**

David J. Beauvais, Oakland, California, for the plaintiffs-appellants.

Daniel C. Cederborg, Office of the County Counsel, County of San Joaquin, Stockton, California, for the defendants-appellees.

**OPINION**

REINHARDT, Circuit Judge:

The Rogers family brought this action under 42 U.S.C. § 1983, alleging that the conduct of social worker Charlotta Royal in removing the Rogers children from their home without a warrant violated their Fourth and Fourteenth Amendment rights. Both parties filed motions for summary judgment, although the Rogerses' was as to liability only. The district court granted Royal's motion on the basis of qualified immunity. Because we hold that it was clearly established that warrantless removal of children is permissible only in cases of exigency, and that it would have been apparent to a reasonable social worker that no exigency existed in this case, we reverse both the grant of summary judgment to Royal and the denial of partial summary judgment to the Rogerses.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 20, 2001, San Joaquin County Child Protective Services received a report of child neglect in the Rogers home. The caller stated that three-year-old Shelby Rogers ("Shelby") and five-year-old Thomas Rogers, Jr. ("Tommy") were not toilet-trained, were locked in their rooms at night and in a room at their parents' business during the day, were not receiving medical or dental care, that Tommy had lost his teeth due to bottle rot, that Shelby was still being fed with a bottle, that their home was dirty and maggot-infested, and that there were unsecured guns in the home. The intake unit did not view this report as requiring an emergency response, but rather classified it as warranting a response within ten days.[1] Three days later, before any action had been taken to investi-

---

[1] Royal testified that the criteria that separate an emergency response from a ten-day response case varies, but examples of emergency response situations would be physical abuse or sexual abuse when the perpetrator is in the home, or the absence of food from the home.

gate the report, Child Protective Services received a second, similar report regarding the Rogers children and likewise classified it as requiring a ten-day response.

On August 31, Royal, a social worker with Child Protective Services, visited the Rogers home, but, finding no one there, departed without leaving a message or a note. She returned a week later, on September 7 at 8:30 a.m. Observing that the family was home, Royal called for the assistance of Lodi Police and waited for the officers to arrive before making contact with the family. Officer Dennis Lewis and at least one other police officer responded.

The family was just getting up when Royal and the officers entered their home.[2] Royal claimed that following her entry she heard Shelby knocking and asking for her mother from inside a bedroom. The mother, Nicole Rogers ("Nicole"), claims, however, that Shelby was neither knocking nor calling for her.

Officer Lewis asked to see the whole family. Nicole went to Shelby's bedroom and unfastened a latch-type lock to open the door. Shelby emerged from the room dressed in a diaper that, according to Royal, appeared to be soiled. Nicole then retrieved Tommy from his bedroom. Tommy emerged wearing pajamas and a pull-up diaper. Royal saw a thumb lock similar to those used in bathroom doors on the outside of Tommy's bedroom door. Royal believed that both children had been locked in their bedrooms, but Nicole testified that Tommy's bedroom door was not locked. The father, Thomas Rogers ("Thomas"), also got out of bed to talk with Royal and Officer Lewis.

Royal asked why the children had locks on their bedroom

---

[2]The parties debate whether the Rogerses consented to the entry, but that issue is not before us on appeal. Thus, our decision does not apply to that question, to the extent that it may still be viable in the district court.

doors. Nicole testified that she told Royal that they had never locked Tommy's door, that his room had a lock on the door when they moved into the house, and that they had simply never removed it. According to her testimony, she also stated that they locked Shelby in her room at night because otherwise she would roam the house and get into things while the rest of the family was sleeping. However, Royal testified that Nicole first stated that she locked the children in their rooms only when she showered, and that only after Royal pointed out that Nicole had not been showering when they arrived did she say that she locked Shelby in at night. Royal testified that she believed Nicole had tried to lie to her and that this concerned her. She said that she was also concerned about the children being locked in their bedrooms because it could result in injury due to lack of supervision or as a result of a fire, and could restrict their access to the bathroom. Royal told the Rogerses that they would have to remove the locks. Nicole testified that she agreed to do so, but Royal contended that the Rogerses did not respond to her statement.

Royal asked why the children were still in diapers. The Rogerses testified that they replied that they were "working with" Tommy, and that while they put a pull-up diaper on him at night, he was "doing good during the day." They said that Shelby was not yet toilet-trained. Royal testified, however, that Nicole told her that "she hadn't had time" to toilet-train the children.

Royal and Officer Lewis inspected Tommy's mouth. Tommy suffered from severe bottle rot. Several of his teeth were missing and his remaining teeth were yellow and showed signs of decay. His mother acknowledged during her deposition that Tommy's mouth had looked "horrible." Nicole told Royal that Tommy had never complained of pain. She said that a dentist had told her that Tommy needed surgery, and she had scheduled an appointment but cancelled it out of fear that Tommy would be harmed, after she and her husband saw a television program about a child dying while under gen-

eral anaesthesia. Royal testified that she believed that this meant the Rogerses were unwilling to take Tommy to the dentist.

Royal asked if the family had medical insurance. According to Nicole, she answered that they did not have medical insurance at the moment but that she was waiting for an application, at which point Royal asked for proof that she had ever had insurance and Nicole showed her old membership cards for Kaiser. Nicole testified that Royal then asked her if the cards were active and she replied that they were not. Royal, however, stated that Nicole first told her that they had medical insurance and then attempted to deceive her by showing her inactive cards when she asked for proof. This, according to Royal, caused her further to doubt Nicole's honesty.

Royal observed that the children had multiple circular bruises on their legs. Nicole stated that the children were always falling down. Royal also observed that Shelby had a large scratch on the side of her face. Nicole and Thomas told Royal that Shelby sustained the scratch when she fell off a chair at their workplace. They explained that they worked in an auto shop in San Leandro and that they took the children with them to work every day. Royal testified that she did not think that the children were being physically abused. She was concerned, however, that, because the children were taken to their parents' place of business every day, they were isolated and would not be seen by pre-school teachers or others who would be required to report suspected abuse.

Royal also observed that Shelby had unkempt hair that appeared to be thin and missing in some areas and that both children were very pale. She believed that the thinning hair could indicate malnutrition and the pale skin could be due to a vitamin deficiency or lack of sunlight. She observed, however, that the refrigerator and kitchen cabinets were well stocked with food and that the bathroom had the necessary toiletries. She told the Rogerses that the children looked very

pale and sickly, and that they could be suffering from a vitamin deficiency or from lack of sunlight. Nicole responded that their pale complexion and Shelby's thin hair were due to the fact that their father has pale skin and fine hair.

The parties dispute the condition of the Rogers home. Royal and Officer Lewis stated that they observed piles of dirty dishes and an overflowing garbage receptacle in the kitchen, as well as piles of dirty clothing scattered about the kitchen, living room and bedrooms. Thomas testified, however, that the garbage receptacles were only partly full. He also testified that the reason for the piles of clothing was that the washer and dryer were broken.

Royal stated that she observed that the children had dirty bedding and mattresses without frames. In Shelby's room, she saw clothing that she believed was dirty scattered on the floor. The Rogerses do not dispute that the children did not have bedframes, but testified that the clothing and bedding were clean. Thomas also testified that Shelby's clothes were on the floor because she had a habit of pulling them out of her dresser to play dress-up. In Tommy's room, Royal observed a brown substance that she believed to be feces smeared on the wall and a substance that she thought was rat droppings on the floor. Officer Lewis observed what he thought was vomit in the bottom drawer of a night stand. Tommy told Royal that the substance on the wall was a smashed graham cracker. The Rogerses testified that the alleged rat droppings on the floor actually consisted of small grains of filling that came out of a broken hacky sack ball, and the purported vomit, like the smears on the wall, was the remains of broken graham crackers.

There were five guns in the Rogerses' bedroom, four of which were unloaded and stored in the closet, and one of which was loaded and kept in the dresser next to the Rogerses' bed. Thomas testified that ammunition for the guns remained in the closet in a childproof container. Nicole testi-

fied that the gun in the dresser had a trigger lock with a key, and the key was located in a jewelry box mounted on the wall.

Royal stated that after her conversation with the Rogerses and her observations of the condition of the home, she believed that the Rogers children had been neglected for some time and that there was an imminent risk to their physical health and safety. Based on this opinion, Royal chose to remove them from their home immediately and place them in the custody of Child Protective Services.[3] Royal did not offer the Rogerses alternative accommodations, medical referrals for the children, or services from the agency whereby the children could remain at home. Royal also did not obtain a warrant.

Royal called for a car seat and, when it arrived, transported the children to Lodi Memorial Hospital. She testified that Tommy complained of mouth pain while at the hospital. She also testified that an attending nurse stated that the children appeared to be malnourished and suffering from a vitamin deficiency. The doctor who saw the children stated in his evaluation that both were "alert" and "playful," but had "poor hygiene." The doctor wrote that Tommy had "many teeth missing" and that Shelby's hair was "sparse, brittle." The doctor also wrote that the purpose of the visit was "medical clearance prior to [Child Protective Services] placement" and classified the visit as routine rather than emergency.

After the medical clearance the children were placed in a shelter. Tommy did not receive any dental care that day or at any time while in the County's custody. The children were returned to their parents on September 20, 2001, after the

---

[3]Royal and Officer Lewis dispute who made the decision to remove the children, with both claiming that the other did so. Royal concedes, however, that this factual dispute is not relevant to the outcome of this appeal because she was ultimately responsible for the decision and could have countermanded it if she had disagreed.

Rogerses made changes to their home and lifestyle as required by Child Protective Services, obtained medical insurance, and arranged for Tommy to have oral surgery. As a result of their time in custody, according to their mother, the children became concerned about being separated from their parents. Nicole further testified that Tommy, in particular, "lost trust in people in general" because of the experience.

The Rogerses appealed the grant of summary judgment to Royal as well as the denial of their own motion for partial summary judgment as to Royal.

## JURISDICTION

The grant of summary judgment is a final order and thereby gives us jurisdiction over both the grant of summary judgment to Royal and the denial of partial summary judgment to the Rogerses. *See Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 694 (9th Cir. 1992). We have declined to exercise our jurisdiction over denials of summary judgment when reviewing orders granting summary judgment where the record has not been fully developed. *Id.* at 694 n.2. Such is not the case here. Moreover, both sides agree that the denial of the Rogerses' motion is properly before us on appeal.

## QUALIFIED IMMUNITY

### I.  *Constitutional violation:*

**[1]** In assessing a claim of qualified immunity, we must first decide whether "the [official's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). "The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law

except in emergencies." *Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001). Officials violate this right if they remove a child from the home absent "information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.' " *Id.* at 1106 (quoting *Wallis*, 202 F.3d at 1138). The Fourth Amendment also protects children from removal from their homes absent such a showing. *Doe v. Lebbos*, 348 F.3d 820, 827 n.9 (9th Cir. 2003). Officials, including social workers, who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant. *Mabe*, 237 F.3d at 1108.

**[2]** Serious allegations of abuse that have been investigated and corroborated usually give rise to a "reasonable inference of imminent danger sufficient to justify taking children into temporary custody" if they might again be beaten or molested during the time it would take to get a warrant. *Ram v. Rubin*, 118 F.3d 1306, 1311 (9th Cir. 1997). However, an official's prior willingness to leave the children in their home militates against a finding of exigency, as does information that the abuse occurs only on certain dates or at certain times of day. *Mabe*, 237 F.3d at 1108; *Wallis*, 202 F.3d at 1140.

**[3]** Under this standard, the district court correctly concluded that Tommy's bottle rot, the children's malnourishment, and the disorderly conditions in the home did not present an imminent risk of serious bodily harm. This is so whether the disputed factual questions are resolved in favor of appellants or defendants.

**[4]** At oral argument, Royal conceded that she could have obtained a warrant within hours. There is no indication in the record that so short a delay could have resulted in a significant worsening of the children's physical conditions or an

increase in the prospects of long-term harm. Royal testified that she thought, after seeing Tommy's mouth, that he could have an abscess and that he almost certainly had an infection. However, she does not assert that she believed that his condition would worsen if she delayed taking him into custody in order to obtain a warrant. Tommy's teeth may have hurt, but, if so, he had likely been experiencing such pain for a considerable period of time and the "pain" was not so serious that he ceased to be "playful" and "alert." Under such circumstances, any pain Tommy may have experienced cannot justify a failure to obtain a warrant or the peremptory removal of the children from their parents' custody. Similarly, Royal's testimony, even viewed in the light most favorable to her, does not suggest that the malnourishment in this case was sufficiently serious to justify the children's immediate removal as both were alert and active, and there was no indication of imminent danger. It is worth noting in this respect that when the children eventually reached the hospital, the doctor did not suggest any immediate treatment for Tommy's bottle rot or Shelby's malnutrition.[4]

[5] Nor do the other circumstances cited by Royal support a finding of exigency, even if her version of all the disputed facts is accepted as true, and even if all of the conditions observed by her are considered collectively. There was no imminent danger of serious bodily harm as a result of Shelby being locked in her room, as this occurred only at night. *Cf. Mabe*, 237 F.3d at 1108 (concluding that the sexual abuse alleged in that case occurred only at night, so there was time to get a warrant before the child would be in imminent danger). The allegations that the children were also locked up during the day at their parents' workplace, even if true, do not

---

[4]Although only the information that Royal had at the time that she made the challenged decision is relevant to the qualified immunity inquiry, the doctor's response is relevant to the question of how serious the children's conditions would have appeared to the reasonable social worker. *Baker v. Racansky*, 887 F.2d 183, 185 n.1 (9th Cir. 1989).

support a finding of imminent risk of serious bodily harm. The chances of accidental injury or of a fire breaking out at the Rogerses' workplace during the few hours that it would take Royal to obtain a warrant were very low. So remote a risk does not establish reasonable cause to believe that the children were in immediate danger.

**[6]** Similarly, the conditions of the home, even if as unsanitary as Royal asserts, fail to indicate any imminent risk of serious bodily harm. Like the bottle rot, the mess in the Rogers living quarters, to the extent that it may have existed, was a chronic, ongoing problem. The presence of disorderliness and a small amount of droppings, feces, and other matter may increase the risk of eventual illness, but there is no indication in the record of any particular risk that the Rogers children would become seriously ill during the few hours that it would take Royal to obtain a warrant. Likewise, it would have presented no risk to the children to delay the commencement of their toilet-training for a few hours while Royal followed the requisite legal procedures.

**[7]** Royal also relies on the family's lack of medical insurance and daycare. These conditions present no imminent danger of harm, and Royal does not argue otherwise. Thus, they, too, provide no support for the warrantless removal. It would certainly be preferable for all children to have medical insurance and quality daycare; given the absence of universal provision of such services, however, reliance on factors so closely related to economic status as a justification for removal would border on the unconstitutional.

**[8]** Royal also argues that the cumulative effect of all of the problems in the Rogers household placed the children in imminent danger. However, her argument falls far short of the mark. Even viewing the factors cumulatively, we have no doubt that there was no imminent danger to either or both of the Rogers children.

**[9]** Our conclusion that no exigency existed here is also supported by the fact that the Child Protective Services delayed in investigating the case and in removing the children. *See Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999) (holding that a 14-day delay by social workers in entering the family home to investigate a report of abuse is evidence of lack of exigency). Here, the concerned officials classified the case as a ten-day response, indicating that they did not think that any exigency existed. In fact, Royal waited until eleven days after the first referral to visit the house for the first time, and an additional seven days, following the first aborted visit, before returning, for a total delay of eighteen days, four days longer than the delay in *Calabretta*. That neither Royal nor the other staff members thought that the allegations required immediate action militates against a finding of exigency. When Royal finally returned to the Rogers home, the evidence she observed may, at most, have supported the anonymous tips received by the Services; it is evident, however, that it provided no basis for concern regarding any additional cause of imminent injuries. Royal's actions after seeing the children also tend to support the view that the circumstances were not exigent. Instead of taking prompt action to obtain medical care as we would have expected her to do if she believed that the children faced imminent danger of serious harm to their health, Royal spent close to two hours talking with the family before deciding to remove the children from the parental home. She further delayed in order to wait for someone to bring a car seat rather than calling for an ambulance or other emergency transport. Although Royal did take the children to the hospital when she finally decided to place them in custody, the visit was treated by hospital staff as a routine screening visit, not as an emergency call.

**[10]** In sum, whether we accept the version of the facts offered by the Rogerses or by Royal, there is no support at all in the record for the conclusion that the Rogers children were likely in imminent danger of serious bodily harm. Thus, we hold that, under any view of the facts, the Rogerses' Fourth

and Fourteenth Amendment rights were violated when Royal removed the children without a warrant.

## II.   *Reasonable Official:*

**[11]** In order to assess Royal's claim of qualified immunity, we must conduct a two-part analysis: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable [official] have believed the conduct was lawful?" *Ram*, 118 F.3d at 1310 (quoting *Carnell v. Grimm*, 74 F.3d 977, 978 (9th Cir. 1996)). The law was clearly established at the time of the events in this case that a child could not be removed from the home without prior judicial authorization absent evidence of "imminent danger of serious bodily injury and [unless] the scope of the intrusion is reasonably necessary to avert that specific injury." *Mabe*, 237 F.3d at 1106; *Wallis*, 202 F.3d at 1138; *Ram*, 118 F.3d at 1310.

**[12]** Notwithstanding this clearly established law, the district court granted Royal qualified immunity, holding that the application of the law to medical neglect was not clearly established. However, it is not necessary that a case be on "all fours" with the facts of the instant case. A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 US at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Prior to the events in question, we had repeatedly held that a family's rights were violated if the children were removed absent an imminent risk of serious bodily harm. A reasonable social worker would need nothing more to understand that she may not remove a child from its home on the basis of a medical condition that does not present such a risk.

**[13]** The district court appeared to be concerned that social workers may have difficulty assessing the imminence of a threat from a particular malady. On that basis, it concluded

that without a case specifically analyzing exigency in cases of bottle rot and malnutrition social workers would not be able to determine whether those conditions present an imminent risk of serious bodily harm. Even if it might be difficult for a social worker without medical training to assess the imminence of the threat posed by some dangerous maladies, such is not the case here. One need not be a licenced physician to recognize that in the case of a child who is both alert and active neither bottle rot nor malnutrition is the type of condition that will lead to serious injury if not corrected within a matter of hours. A reasonable social worker could reach no other conclusion. Even Royal stated during her deposition that in her opinion bottle rot does not amount to exigency. Thus, because a reasonable social worker would have understood that the children faced no imminent risk of serious bodily harm, as required by clearly established law, the district court erred in granting qualified immunity to Royal and denying partial summary judgment to the Rogerses.

## CONCLUSION

Child abuse and neglect are very serious problems. We applaud the efforts of social workers to address these matters and to protect the vulnerable victims of these crimes. "No one can doubt the importance of this goal." *Cf. Mincey v. Arizona*, 437 U.S. 385, 393 (1978). However, the rights of families to be free from governmental interference and arbitrary state action are also important. Thus, we must balance, on the one hand, the need to protect children from abuse and neglect and, on the other, the preservation of the essential privacy and liberty interests that families are guaranteed under both the Fourth and Fourteenth Amendments of our Constitution.

Assuming Royal's version of the facts, the Rogers children were in a sorry state and suffering from neglect of a type that could, if their parents' conduct was not modified within a reasonable period of time, lead to long-term harm. Still, the conditions here did not present an imminent risk of serious bodily

harm. It would have taken Royal only a few hours to obtain a warrant. In removing the Rogers children from their home without obtaining judicial authorization, Royal violated the Rogerses' clearly established Fourth and Fourteenth Amendment rights. The lack of exigency would have been apparent to any reasonable social worker. Accordingly, we conclude that the district court erred in granting qualified immunity to Royal and in denying the Rogerses' motion for partial summary judgment as to Royal.

We REVERSE the grant of summary judgment to Royal and we likewise REVERSE the denial of the Rogerses' partial summary judgment motion with respect to her. We REMAND with instructions to grant partial summary judgment to the Rogerses and for further proceedings consistent with this opinion.

REVERSED and REMANDED.