FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELLEN KEATES; A. K., a minor, through her parent and guardian Ellen Keates,
*Plaintiffs-Appellants*,

v.

MICHAEL KOILE; KAREN HOWARD; GILLIAN VANESSE; RITA GOMEZ; SARAH JENKINS; KIMBERLY PENDER; JOANNA LENSCHE; AND STEVE ROUNTREE, individually as employees with the State of Arizona Child Protective Services; CLARENCE H. CARTER, individually as Director, Arizona Department of Economic Security; STATE OF ARIZONA, a political entity; UNKNOWN PARTIES, John and Jane Does 1–5; Black Entities 1–5,
*Defendants-Appellees*.

No. 16-16568

D.C. No.
2:15-cv-01270-NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted December 4, 2017
San Francisco, California

Filed March 6, 2018

Before:  Milan D. Smith, Jr. and Sandra S. Ikuta, Circuit
Judges, and John D. Bates,[*] District Judge.

Opinion by Judge Ikuta

**SUMMARY**[**]

**Civil Rights**

The panel affirmed in part and reversed in part the district
court's dismissal of an action against Child Protective
Services officers and employees alleging constitutional
violations arising from defendants' actions in removing a
minor child A.K. from her mother's custody following A.K.'s
hospitalization for depression and suicidal ideation, and
remanded.

The panel held that this Circuit's case law clearly
establishes that the rights of parents and children to familial
association under the Fourteenth, First, and Fourth
Amendments are violated if a state official removes children

---

[*] The Honorable John D. Bates, United States District Judge for the
District of Columbia, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion is reasonably necessary to avert the specific injury at issue.

The panel held that the district court erred in dismissing the familial association claim against defendants Koile and Pender on the basis of qualified immunity. The panel held that the operative complaint alleged sufficient facts to establish that defendants violated plaintiffs' constitutional rights to familial association. The panel further determined that a reasonable official in defendants' position would have known that the available information did not establish reasonable cause to believe that A.K. was in imminent danger of attempting to commit suicide, or that it was necessary to separate her from her mother, transfer her to a treatment center, and continue to detain her after medical professionals concluded she was a low suicide risk.

The panel held that the district court did not err by dismissing plaintiffs' judicial deception claim. The panel determined that it could not say that defendant's statement in the dependency petition was a deliberate falsehood or constituted judicial deception in light of the specific context of the case.

The panel held that there was sufficient evidence to make a plausible allegation that defendants Lensche and Rountree were integral participants in violating plaintiffs' constitutional rights. As to the claims against four other defendants, the panel held that the complaint did not offer any plausible allegation that the defendants participated in the

decision to interfere with plaintiffs' constitutional rights, and therefore the district court did not err in dismissing those claims.

Finally, the panel held that the complaint did not allege that the Director of the Arizona Department of Economic Security was directly involved in the allegedly unconstitutional conduct or that he had knowledge of the constitutional deprivations and acquiesced in them. The panel held that plaintiffs' conclusory allegations that the unconstitutional policies and procedures caused the unconstitutional conduct did not suffice to state a claim of supervisory liability.

**COUNSEL**

Geoff Morris (argued) and DeeAn Gillespie Strub, Gillespie Shields Durrant & Goldfarb, Phoenix, Arizona, for Plaintiffs-Appellants.

James B. Bowen (argued), Assistant Attorney General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellees.

**OPINION**

IKUTA, Circuit Judge:

Ellen Keates and her minor child, A.K., appeal the dismissal of their claims against Michael Koile and other officers and employees of what was then the Child Protective Services (CPS) division of the Arizona Department of

Economic Security (ADES), which allege (among other things) violations of Keates's and A.K.'s constitutional rights to familial association.[1]  These claims all stem from CPS's actions to remove A.K. from her mother's custody following A.K.'s hospitalization for depression and suicidal ideation. We conclude that certain of Keates's and A.K.'s claims against the defendants who allegedly participated in the interference with familial association withstand the motion to dismiss.

I

The operative complaint includes the following factual allegations.  In May 2013, A.K. was thirteen years old and had been experiencing depression for four to six months, and "[o]n occasion, she had suicidal ideations."  Ellen Keates is the mother of A.K.  On May 20, 2013, Keates took A.K. to Christ Cares Clinic where A.K. told an employee that she was sad and had contemplated suicide in the past, but stated that she was not currently experiencing suicidal ideation.  The clinic employee referred A.K. to the emergency room at Phoenix Children's Hospital (PCH), where A.K. was seen by a triage nurse and a doctor who ordered a psychological consultation and evaluation by a social worker.

Notes from the triage nurse at PCH stated that A.K. expressed feeling sad and depressed, admitted to having suicidal ideation, "but denied having a plan to carry it out." Several hours later, Randy Call, a PCH employee, and Julie

---

[1] The other defendants are Koile's supervisor, Kimberly Pender, six other CPS employees (Karen Howard, Gillian Vanesse, Rita Gomez, Sarah Jenkins, Joanna Lensche, and Steve Rountree), and Clarence Carter, Director of ADES.

Kaplan, a PCH social worker, told Keates that A.K. could go home if Keates provided a safety plan for A.K. Keates offered several options, including having A.K. stay home with her twelve-year old brother, having A.K. stay with a neighbor, or dropping A.K. off at the public library. Call and Kaplan rejected these options. Keates explained that she was self-employed and staying at home would cost her some business, but Keates nevertheless said she would stay home with A.K.

Call and Kaplan then informed Keates that the decision had been made to prevent A.K. from going home with Keates, and that she was required to go to a mental hospital for inpatient treatment. Keates stated that she lacked health insurance to pay for inpatient treatment. When Call, Kaplan, or another hospital staff person asked Keates for her contact information, Keates said she was "unwilling to give PCH agents information that could lead [her] to being billed for an unnecessary, and increasingly costly, stay at PCH." Keates "furiously expressed her concern" to hospital staff that "PCH was going to hold A.K. hostage until PCH received information to bill [her]." Nevertheless, while talking to Call and Kaplan, Keates did provide her name, phone number and other contact information.

At some point after Keates had refused to provide contact information for billing, "someone" from PCH called CPS to report that "A.K. was suffering *severe* depression and had attempted a suicide by strangulation on May 20, 2013." PCH staff told CPS that "inpatient care was necessary"—although they had previously told Keates it was merely recommended—and that Keates "was not able to enact a safety plan." Kaplan subsequently wrote a report stating that "[b]ecause mother refused to provide any identifying

information, other than [patient's] name, CPS report was made during assessment for fear that mother would take [patient] and leave." Randy Call spoke to or was referred to CPS employees Joanna Lensche and Steve Rountree. CPS employees Michael Koile, Kim Pender, and Gillian Vanesse were also involved early in the investigation.

At the end of the discussion among Keates and PCH staff, Kaplan told Keates that A.K. would be reassessed in the morning and that Keates should go home and call PCH for the results of the second assessment the next day. Keates went home, but when she called the next morning, May 21, she was told "there would be no second assessment and that CPS had told PCH that Ms. Keates was not to have any contact with A.K. and was not to come back to PCH."

On the morning of May 21, Koile, a CPS case worker, interviewed A.K. without Keates present and without Keates's consent. A.K. reported that her only complaint about her mother was that she "yells, screams, and cusses." A.K. also told Koile that she had suicidal ideation in the past but had not attempted suicide on May 20; the doctor at Christ Cares Clinic had misunderstood her.

Later on May 21, around 11:45 A.M., Koile issued a temporary custody notice (TCN) allowing him to take A.K. away from Keates and put her into CPS custody. In preparing and issuing this order, Koile collaborated with his colleagues, Joanna Lensche and Steve Rountree, and had the advice, consent and approval of his supervisor, Kim Pender. Keates was not at the hospital at the time Koile issued the TCN. A CPS case worker, Karen Howard, later wrote a letter to Keates stating that CPS took custody of A.K. because Keates did not have health insurance and was unwilling to share her

contact information with PCH. Koile told PCH that Keates was "prohibited from visiting A.K. during the remainder of A.K.'s stay at PCH."

A.K. was discharged from PCH on May 21, 2013. She was strapped to a gurney and delivered by ambulance to Aurora Behavioral Health System (ABHS) in Tempe, Arizona. During intake at ABHS, Koile told the intake nurse that A.K. had tried to commit suicide on May 20, 2013. But A.K. told the intake nurse that she "did not have, at that time, any [suicidal ideation]" and while "she had some [suicidal ideation] over the course of the previous several months," she had no plan to commit suicide. She stated that "she was depressed but she did not feel like she needed to be here" and told the intake nurse that the doctor at Christ Cares Clinic "misunderstood her in that A.K. had thoughts of choking herself in the past, but that was a while ago and she did not feel like that now." The intake nurse at ABHS found A.K.'s suicide risk to be low.

A.K. remained at ABHS despite the intake nurse's conclusion that she was low risk. A.K. expressed her desire to go home and her anger at not being able to have any contact with her mother. Nevertheless, Koile directed ABHS not to allow Keates to have contact with A.K.

On May 22, 2013, Koile interviewed Keates, who told him that A.K. did not attempt suicide on May 20. The next day, Koile informed ABHS that he had concluded that Keates was unable to care for A.K. and that a dependency petition would be filed. The Arizona Department of Economic Security filed a dependency petition on behalf of CPS on May 24, 2013. The petition stated that A.K. attempted suicide on May 20, 2013.

Koile told Keates that A.K. would be required to receive "intensive outpatient treatment at ABHS" and that if Keates "could not make financial arrangements for that care, A.K. was not going home." On May 29, 2013, A.K. was discharged from ABHS, which again assessed her as having a low risk for suicide. ABHS told Keates that A.K. did not need intensive outpatient treatment, and that it "rarely ever provides such treatment."

After she was discharged from ABHS, A.K. was placed in a foster home. She did not receive intensive outpatient treatment or her prescribed psychotropic drugs. She was placed in a shelter when her foster mother went on vacation and was later placed in a group home. The group home initially failed to transport A.K. to high school, where she had been accepted into the honors program, and only later provided transportation pursuant to a court order. After spending nearly four months outside of her mother's custody, A.K. returned home on September 12, 2013. The dependency petition was dismissed on November 26, 2013.

Keates, on behalf of herself and A.K., filed this action in state court, and the defendants removed the case to federal court. Keates filed the operative complaint, which alleged that the defendants had violated Keates's and A.K.'s constitutional rights to familial association under the First, Fourth, and Fourteenth Amendments and the right to be free from deliberately falsified evidence in dependency proceedings, among other claims. The complaint also alleged various state law claims.

The district court dismissed Keates's constitutional claims with prejudice on the ground that all defendants were entitled to qualified immunity. The district court concluded that

Koile did not violate Keates's and A.K.'s constitutional rights to familial association because Koile had reasonable cause to believe that A.K. was in imminent danger of serious bodily injury, and the scope of the intrusion was reasonably necessary to avert that injury. Further, the district court held that the complaint did not allege facts sufficient to establish that Koile presented deliberately fabricated evidence to the juvenile court. It remanded the remaining state claims to state court. Keates and A.K. timely appealed.

II

We review a district court's grant of a motion to dismiss and issues of qualified immunity de novo. *Price v. Hawaii*, 939 F.2d 702, 706 (9th Cir. 1991). The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

At the motion-to-dismiss stage, we take all well-pleaded factual allegations in the complaint as true, construing them "in the light most favorable to the nonmoving party," *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008), and then determine "whether they plausibly give rise to an entitlement to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

This appeal raises an additional wrinkle because the district court granted the motion to dismiss largely on the ground that defendants were entitled to qualified immunity. Determining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making. *See Kwai Fun Wong v. United States*, 373 F.3d 952, 956–57 (9th Cir. 2004). On the one hand, we may not dismiss a complaint making "a claim to relief that is plausible

on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). But on the other hand, defendants are entitled to qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has emphasized that this is a low bar, explaining that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Indeed, "[w]hen properly applied," qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Balancing these competing rules, when a district court dismisses a complaint for failure to state a claim based on a qualified immunity defense, we consider whether the complaint alleges sufficient facts, taken as true, to support the claim that the officials' conduct violated clearly established constitutional rights of which a reasonable officer would be aware "in light of the specific context of the case." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). If the operative complaint "contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right," then plaintiffs are "entitled to go forward" with their claims. *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992). But our decision at the motion-to-dismiss stage sheds little light on whether the government actors might ultimately be entitled to qualified immunity "were the case permitted to proceed, at least to the summary judgment stage" and the

court is presented with facts providing context for the challenged actions. *Kwai Fun Wong*, 373 F.3d at 957.

### III

Because the operative complaint here was dismissed on qualified immunity grounds, we must determine whether Keates and A.K.'s complaint pleads a plausible claim that withstands a qualified immunity defense. We review a grant of qualified immunity de novo. *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005).

In determining whether a government official is entitled to qualified immunity, we consider two different questions: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right"; and (2) if so, "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009).

### A

The operative complaint's primary claim is that the defendants violated Keates's and A.K.'s rights to familial association. Therefore, we begin by looking to our case law to delineate the scope of the constitutional right to familial association at issue in this case. This right is entirely judge-made; it does not appear in the text of the Constitution itself. Nor have courts been entirely clear regarding the source of the right; they have variously relied on the Fourteenth, First, and Fourth Amendments.

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. The Supreme Court has stated that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (addressing the "Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment"). Courts have characterized the right to familial association as having both a substantive and a procedural component. While the right is a fundamental liberty interest, *see, e.g.*, *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011); *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc), officials may interfere with the right if they "provide the parents with fundamentally fair procedures," *Santosky*, 455 U.S. at 753–54.

The First Amendment also protects "family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (quoting *Board of Dirs. v. Rotary Club*, 481 U.S. 537, 545 (1987)). This right was first identified in *Roberts v. United States Jaycees*, which indicated that protecting intimate relations "from unwarranted state interference" was necessary to safeguard "the ability independently to define one's identity that is central to any concept of liberty." 468 U.S.

609, 619 (1984). The Court subsequently confirmed that "the First Amendment protects . . . family relationships." *Board of Dirs.*, 481 U.S. at 545. Accordingly, we have held that claims under both the First and Fourteenth Amendment for unwarranted interference with the right to familial association could survive a motion to dismiss. *See Lee*, 250 F.3d at 686.

In addition to the Fourteenth and First Amendment rights to familial association, "[w]e evaluate the claims of children who are taken into state custody under the Fourth Amendment right to be free from unreasonable seizures rather than the Fourteenth Amendment right to familial association." *Kirkpatrick v. County of Washoe*, 792 F.3d 1184, 1189 (9th Cir. 2015), *on reh'g en banc*, 843 F.3d 784 (9th Cir. 2016) (internal quotation marks omitted); *see also Wallis v. Spencer*, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000) (holding that the childrens' claims "should properly be assessed under the Fourth Amendment"). Despite the different constitutional source of the right, we have held that "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children." *Wallis*, 202 F.3d at 1137 n.8.

We have woven these constitutional threads into a discrete constitutional right in cases where state officials remove children from parents without consent or due process. Our cases hold that the Fourteenth, First, and Fourth Amendments provide a guarantee "that parents will not be separated from their children without due process of law except in emergencies." *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107–09 (9th Cir. 2001). Officials may not remove children from their parents without a court order unless they have "information at the time of the seizure that establishes reasonable cause to believe that the

child is in imminent danger of serious bodily injury." *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007) (internal quotation marks omitted). Such "reasonable cause" arises, for example, where there is evidence of imminent abuse after sufficient investigation. Thus "[s]erious allegations of abuse that have been investigated and corroborated" may give rise to a reasonable inference that children "might again be beaten or molested during the time it would take to get a warrant" unless the official takes the children into temporary custody. *Id.* at 1294–95. Lack of health insurance, by contrast, does not provide a reasonable cause to believe a child is in imminent danger. *Id.* at 1296.

An official "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued." *Wallis*, 202 F.3d at 1138; *see id.* (quoting *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986), for the proposition that an officer has a duty to "make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest and detention"). Further, because the "scope of the intrusion" must be "reasonably necessary to avert" a specific injury, the intrusion cannot be longer than necessary to avert the injury. *Id.* at 1140–41 (indicating that children could be held away from their parents only for so long as the emergency existed).

In *Wallis v. Spencer*, for instance, we considered a claim brought by parents and their two young children against the City of Escondido after police officers seized their children without a court order. *Id.* at 1131. The seizure occurred after the mother's institutionalized and severely mentally ill sister told her therapist that her brother-in-law was planning to sacrifice his young son to Satan on the Fall Equinox. *Id*. The therapist reported this threat, which ultimately made its way

to the police, who entered the family's home around midnight and took custody of the children and transported them to a county institution. *Id.* at 1132–34. Without parental presence or consent, the children were taken to a local hospital where they were subjected to internal body cavity examinations to determine whether abuse had occurred. *Id.* at 1135. They remained in state custody for two and a half months before being returned to their parents. *Id.* at 1134.

Proceeding under the Fourteenth Amendment (as to the claims of the parents) and the Fourth Amendment (as to the claims of the children), but applying the same legal standard, *see id.* at 1137 n.8, Wallis held that there were genuine issues of material fact as to whether the police had reasonable cause to believe that the children "faced an immediate threat of serious physical injury or death," and whether "the actions taken by the officers—removing the children from their mother and placing them in an institution—exceeded the permissible scope of the action necessary to protect them from that immediate threat," *id.* at 1138 (emphasis omitted). There were triable issues of fact as to whether the officers had pursued reasonable avenues of investigation, and whether "the scope and degree of the state interference was justified by the alleged exigency." *Id.* at 1140. In particular, because the police had no information that the alleged sacrifice plot extended beyond the Equinox, there was a genuine issue of material fact "as to whether the emergency continued to exist for more than the brief day or two following the time of the children's seizure." *Id.* *Wallis* did not address the question whether the City could be held liable for detention of the children after their removal was approved by a juvenile court. *Id.* at 1141.

In sum, our case law clearly establishes that the rights of parents and children to familial association under the Fourteenth, First, and Fourth Amendments are violated if a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue.

B

Turning to the first of the two qualified immunity inquiries, we must now determine whether the operative complaint alleges sufficient facts, accepted as true and construed in the light most favorable to Keates and A.K., to establish that Koile and the other defendants violated Keates's and A.K's constitutional rights to familial association. For the reasons that follow, we conclude that the allegations are sufficient to state "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Based on the allegations in the complaint, Koile's exercise of authority over A.K. interfered with Keates's relationship with A.K. First, on May 21, Koile detained A.K. at PCH and had hospital staff inform Keates that she could not have contact with her daughter or take her home. Further, Koile interfered with the right of familial association by issuing a TCN on May 21, and transporting A.K. strapped to a gurney by ambulance to ABHS the same day, where she was held without her parent's consent and without a court order. *See Wallis*, 202 F.3d. at 1134–35.

These actions would not constitute a violation of Keates's and A.K.'s rights to familial association if the defendants had information at the time of the seizure, after reasonable investigation, giving rise to a reasonable cause to believe that A.K. was in imminent danger of serious bodily injury, and if the scope of the intrusion was reasonably necessary to prevent serious bodily injury. *See id.* at 1138. Based on the allegations of the complaint, however, these requirements were not met. Although Koile could have given weight to the call from "someone" at PCH on May 20 stating that A.K. had tried to commit suicide, the allegations in the complaint establish that Koile did not undertake a reasonable investigation as to whether A.K. was in imminent danger due to her mother's presence. According to the complaint, Koile did not corroborate the PCH call to CPS or obtain other medical opinions on whether A.K. was at risk. Because both Keates and A.K. repeatedly informed Koile that A.K. was not actively suicidal, a reasonable official in Koile's position would have known that further investigation was necessary. Moreover, after Koile issued a TCN and transferred A.K. to ABHS, the intake nurse at ABHS determined that A.K. was "low-risk" for suicide, further undercutting any reasonable belief that A.K. was in imminent danger. Nevertheless, the complaint alleges that A.K. was detained at ABHS at least two more days before Koile sought a court order. *See id.* at 1140 (stating that "the scope and degree of the state interference" must be "justified by the alleged exigency").

The complaint further alleges facts plausibly indicating that Koile had sufficient time to obtain a warrant. *See Rogers*, 487 F.3d at 1294. On May 20, when Koile first talked to A.K., she was in a hospital and under medical supervision. According to the complaint, Keates did not attempt to remove A.K. from PCH but allowed her to stay

overnight and merely called for a status report the next day. "[T]he unlikely possibility" that Keates might "unexpectedly abscond" with A.K. does not "justify dispensing with the warrant requirement." *See Kirkpatrick v. County of Washoe*, 843 F.3d 784, 792 (9th Cir. 2016) (en banc). Although PCH was concerned about Keates's lack of health insurance and her ability to pay for treatment, such a concern does not give rise to an imminent danger that would allow the state to dispense with obtaining a court order. *Rogers*, 487 F.3d at 1296.

Finally, the complaint plausibly indicates that Koile exceeded the scope of any intrusion necessary to protect A.K. *See Wallis*, 202 F.3d at 1140. Based on the allegations in the complaint, there was no basis for preventing Keates from having contact with A.K. According to the complaint, A.K.'s only concern about her mother was that she "yells, screams, and cusses"; nothing in the complaint indicates that Keates was involved in any past or planned future abuse of A.K. or that contact with Keates would lead to injury. *See id.* at 1140–41. There was also no basis for requiring A.K. to be strapped to a gurney when she was transported to ABHS, because nothing in the complaint suggests A.K. posed an imminent danger to herself that might justify such restraints. Detaining A.K. at ABHS also exceeded the necessary scope of any intrusion because ABHS's assessment made clear that any threat of immediate harm had dissipated. *See id.* at 1140. Accordingly, we conclude that the operative complaint plausibly alleges that Koile violated Keates's and A.K.'s rights to familial association.[2]

---

[2] Although the complaint is not entirely clear, it indicates that at some point after defendants filed a dependency petition in Arizona state court on May 24, 2013, the court issued an order making A.K. a temporary ward

Turning to the second prong of the qualified immunity inquiry, "whether the right was clearly established," *Saucier*, 533 U.S. at 201, we must determine whether it was so clear that Koile's actions violated Keates's and A.K.'s rights to familial association that any reasonable officer "would have understood that what he is doing violates [those] right[s]." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 563 U.S. at 741. We must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau*, 543 U.S. at 198).

Koile argues that the facts alleged in the complaint show that a reasonable officer in Koile's position would not have known that his specific actions violated Keates's and A.K.'s constitutional rights. Koile argues that he acted reasonably because he was told by "qualified medical providers" at PCH that A.K. was actively suicidal and needed inpatient treatment. According to Koile, this information, along with allegations in the complaint that the care provider at Christ Cares Clinic referred A.K. to the emergency room, that Keates refused to provide contact information because she believed that the hospital was attempting to hold A.K.

---

of the state, and did not terminate this condition until November 25, 2013. We have previously left open the question whether an official defendant could be "held liable for any detention of [a child] after [the child's] removal was approved by the juvenile court." *Wallis*, 202 F.3d at 1141. Because Keates has not fully addressed this issue in her briefs, we leave it to the district court on remand to determine whether events after the date of the juvenile court hearing violated Keates's and A.K.'s constitutional rights.

hostage until it obtained information for billing, and that CPS was concerned that A.K.'s mother would remove A.K. from care if CPS did not act immediately, shows that Koile was reasonable in taking immediate action to protect A.K. and to insure that she got the care that heath care professionals said that she needed.

We disagree, because Koile's arguments are not supported by the complaint. Most important, nothing in the complaint indicates that qualified medical professionals at PCH advised CPS that A.K. was actively suicidal; it states only that "someone from PCH" called CPS with that information and with the recommendation that inpatient care was necessary. The complaint alleges that Keates and A.K. arrived at PCH Emergency voluntarily on the advice of Christ Cares Clinic, and does not allege that the clinic warned PCH that A.K. was in imminent danger. Nor does the complaint contain facts establishing that a reasonable officer in Koile's situation would have been concerned that Keates might take A.K. home against medical advice. The complaint alleges that Keates did provide Call and Kaplan with her contact information, and that Keates left A.K. in the hospital overnight and merely called in the next morning. Further, there is no allegation in the complaint that Koile was aware of Kaplan's report that PCH was concerned that "mother would take [patient] and leave."

Accordingly, based solely on the facts alleged in the complaint construed in favor of Keates and A.K., a reasonable official in Koile's position would know the available information did not establish reasonable cause to believe that A.K. was in imminent danger of attempting to commit suicide, or that it was necessary to separate her from her mother, transfer her to ABHS, and continue to detain her

after medical professionals at ABHS concluded she was a low suicide risk. Therefore, we conclude that the operative complaint alleges facts that allow us "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The district court therefore erred in dismissing the familial association claim against Koile and Pender on the basis of qualified immunity. However, "[o]ur denial of qualified immunity at this stage of the proceedings does not mean that this case must go to trial." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016). As we have previously noted, "[o]nce an evidentiary record has been developed through discovery, defendants will be free to move for summary judgment based on qualified immunity." *Id.*

IV

We now turn to Keates's and A.K.'s claim that the defendants violated their due process right to be free from deliberately false statements during juvenile court proceedings. In order to prevail on a judicial deception claim, a plaintiff must prove that "(1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). If a state official "submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, . . . he cannot be said to have acted in a reasonable manner, and the shield of qualified immunity is lost." *Chism v. Washington State*, 661 F.3d 380, 393 (9th Cir. 2011) (quoting *Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991)).

We again begin by determining whether the operative complaint alleges sufficient facts, accepted as true and

construed in the light most favorable to Keates and A.K., to establish that their due process rights were violated. The complaint makes a single factual allegation supporting this claim, namely that the dependency petition used to obtain a court order "falsely stated that A.K. attempted suicide on May 20, 2013 even though A.K. specifically told Mr. Koile, PCH employees, or agents, and ABHS employees, or agents, that she *did not* attempt a suicide on May 20, 2013 and at any time in the recent past." The complaint does not, however, provide a basis for concluding that Koile's inclusion of the statement that A.K. attempted suicide was a deliberate falsehood. The complaint states that "someone" at PCH reported to CPS that "A.K. was suffering *severe* depression and had attempted a suicide by strangulation on May 20, 2013," and a reasonable officer in Koile's position could have given more weight to this information from the hospital than to the denials from Keates and A.K.

It is a closer question whether the statement in the dependency petition that A.K. attempted suicide was made with reckless disregard for the truth. By the time the dependency petition was filed on May 24, Koile should have been aware of ABHS's diagnosis on May 21 that A.K. was at low risk for suicide and he would have had time to investigate the PCH report about A.K.'s suicide attempt. Nevertheless, ABHS's prediction of A.K.'s suicide risk in the future does not directly contradict the statement from "someone" at PCH that A.K. had attempted suicide on May 20. Given that qualified immunity is intended to give officials "breathing room to make reasonable but mistaken judgments," *Al-Kidd*, 563 U.S. at 743, we conclude that the complaint did not plausibly allege that Koile knew or recklessly disregarded the truth when he included this statement in the dependency petition.

Accordingly, even assuming all the allegations in the complaint are true, we cannot say that Koile's statement in the dependency petition was a deliberate falsehood or constituted judicial deception, "in light of the specific context of the case," *Mullenix*, 136 S. Ct. at 308. Therefore, the district court did not err in granting the motion to dismiss this claim.

V

We next turn to Keates's and A.K's arguments that the district court erred in dismissing the claims against Carter, Howard, Vanesse, Gomez, Jenkins, Lensche and Rountree. These defendants cannot be held liable for a constitutional violation under 42 U.S.C. § 1983 unless they were integral participants in the unlawful conduct. *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996). We have held that defendants can be liable for "integral participation" even if the actions of each defendant do not "rise to the level of a constitutional violation." *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). In *Boyd*, for instance, the plaintiff brought suit under § 1983 against city and county police officers for injuries incurred when the police threw a flash-bang device into an apartment prior to a search. Although a single officer threw the device into the apartment, we held that the other officers involved in the operation were "integral participants" because: (1) they stood armed behind the individual deploying the flash-bang; (2) "the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way"; and (3) "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed." *Id*. Accordingly, we concluded that the participating officers could be liable for

the constitutional violation. *Id.* We reached a different conclusion in *Sjurset v. Button*, 810 F.3d 609 (9th Cir. 2015). In that case, where the decision to remove children from their parents' home was made by a state agency, and there were no facts suggesting that police officers who actually removed the children were "privy to any discussions, briefings or collective decisions" made by the agency "in its protective-custody determination," we held that the police officers could not be held liable for violating the family's constitutional rights. *Id.* at 619.

On a motion to dismiss, we must determine whether the complaint plausibly alleges that each of the defendants was an integral participant in the violation of Keates's and A.K.'s rights to familial association. The complaint alleges that Lensche and Rountree, who were employees of CPS, spoke to Randy Call, a PCH employee who informed Keates that A.K. was not allowed to leave, and that Lensche and Rountree "collaborated in the issuance of the TCN." These allegations, though sparse, indicate that Lensche and Rountree were aware of A.K.'s situation at PCH and participated in a meaningful way in a collective decision to issue a TCN. The TCN was central to the alleged constitutional violation, as it was the basis for Koile's seizure and removal of A.K. to ABHS. Accordingly, we conclude that this is sufficient—though just barely—to make a plausible allegation that Lensche and Rountree were integral participants in violating Keates's and A.K.'s constitutional rights. Therefore, the district court erred in finding that the operative complaint failed to state a claim against Lensche and Rountree.

The complaint's allegations against Howard, Vanesse, Gomez, and Jenkins are insufficient, however, to show

integral participation. For example, the complaint alleges that PCH employees spoke to CPS supervisor Gillian Vanesse on the morning of May 21, and that she was otherwise "involved early in the investigation." There is no allegation, however, that Vanesse "collaborated in the issuance of the TCN." The complaint also alleges that social worker Karen Howard sent a letter to Keates in September 2013, stating that CPS took custody of A.K. because Keates lacked insurance and did not willingly share her contact information with PCH. This occurred months after CPS initially took custody of A.K., however, and the complaint does not allege any participation by Howard before then. Nor does the complaint make any specific allegations regarding Gomez or Jenkins. Because the complaint does not offer any plausible allegation that any of these CPS employees participated in the decision to interfere with Keates's and A.K.'s constitutional rights, the district court did not err in dismissing the claims against them.[3]

Finally, the complaint alleges that Carter was an "official policymaker" for CPS and "was responsible for [implementation] of those policies in a manner that violated Plaintiffs' constitutional rights." Further, the complaint alleges that "all or some of the unconstitutional actions or conduct . . . are the direct result of the unconstitutional policies, procedures and practices promulgated by Defendant

---

[3] Keates's argument that she should be excused from making the necessary factual allegations because she was not in a position to know all relevant factual details of the defendants' involvement in the removal decision is unavailing. *See Iqbal*, 556 U.S. at 678–79 (holding that "only a complaint that states a plausible claim for relief survives a motion to dismiss" and the federal rules allowing notice pleading "do not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Carter." The complaint does not allege that Carter knew of or was directly involved in the decisions leading to CPS taking custody of A.K.

Because vicarious liability is inapplicable to § 1983 suits, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. A supervisory official may be held liable under § 1983 only "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal quotation marks omitted)). Even if a supervisory official is not directly involved in the allegedly unconstitutional conduct, "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)). Therefore, the claim that a supervisory official knew of unconstitutional conditions and "culpable actions of his subordinates" but failed to act amounts to "acquiescence in the unconstitutional conduct of his subordinates" and is "sufficient to state a claim of supervisory liability." *Id*.

The complaint here does not allege that Carter was directly involved in the allegedly unconstitutional conduct or that he had knowledge of the constitutional deprivations and acquiesced in them. Rather, the complaint makes conclusory allegations that Carter promulgated unconstitutional polices

and procedures which authorized the particular conduct in this case and thus directly caused Koile's allegedly unconstitutional conduct. These allegations do not suffice to state a claim of supervisory liability. A court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), or "an unadorned, the-defendant-unlawfully-harmed-me accusation," *id*. Because the conclusory allegations in the complaint are speculative and do not state a plausible claim for relief against Carter, the district court did not err in dismissing him.

## VI

We reverse the district court's dismissal of Keates's and A.K.'s claim for violation of their constitutional right to familial association on qualified immunity grounds, affirm the district court's dismissal of their claim for violation of their due process right to be free from deliberately false statements in state court dependency proceedings, reverse the dismissal of the claim that Lensche and Rountree violated their constitutional right to familial association, and affirm the dismissal of that claim against Carter, Vanesse, Howard, Gomez, and Jenkins. Each party will bear their own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.